UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Scott Wilkerson,<br><br>    *Plaintiff*,<br><br>v.<br><br>Ann & Robert H. Lurie Children's Hospital of Chicago,<br><br>    *Defendant*. | No. 24 CV 8488<br><br>Judge Lindsay C. Jenkins |

**MEMORANDUM OPINION AND ORDER**

    Following his resignation, Scott Wilkerson filed suit against his former employer, Ann & Robert H. Lurie Children's Hospital of Chicago ("Lurie Children's"), alleging that it failed to pay him both severance and owed incentive compensation. For each, he raises claims for breach of contract and violation of the Illinois Wage Payment and Collection Act ("IWPCA"). In April, the court dismissed his claims for severance with prejudice, and Wilkerson now moves for reconsideration. Lurie Children's has also moved for judgment on the pleadings. For the following reasons, both motions are denied.

**I.    Background**

    Scott Wilkerson was employed at Lurie Children's from May 2014 until his resignation in May 2023. [Dkt. 1 ¶ 4.] In November 2020, Lurie Children's offered Wilkerson the position of Senior Vice President, Chief Integration and Business Development Officer. [*Id.* ¶ 11.] After rejecting the offer because it lacked a severance provision, Wilkerson received and signed a revised offer ("Offer Letter"), which read in part:

> Your annualized base salary in your new role will be $576,622, and you will be eligible for management incentive compensation up to 40% of your base salary. Incentive compensation will be determined based on mutually established objectives as well as achievement of organizational goals, and plan terms that are subject to approval by the Compensation Committee of the Board of Directors. …
>
> In the unlikely event your employment should be terminated for any reason other than cause, you will receive severance pay of twelve (12) months' salary.

1

[*Id.* ¶¶ 12–13; Dkt. 1-1.] He remained in the role until he resigned in May 2023. [Dkt. 1 ¶¶ 5, 17.]

In his resignation letter, Wilkerson requested "a draft severance agreement in accordance with [his] employment letter." [Dkt. 1-3.] Lurie Children's, however, paid neither severance nor a *pro-rata* share of his Fiscal Year 2023 incentive compensation, which he also sought. [Dkt. 1 ¶¶ 19–20.] Regarding the latter, Lurie Children's reasons that its FY23 Leadership Incentive Plan ("LIP") "specifically states a participant must be an employee at the time of payout," and so Wilkerson was not entitled to any share of incentive compensation upon his mid-fiscal year resignation. [Dkt. 25 at 19.][1]

Wilkerson sued, bringing claims for breach of contract and violations of the IWPCA for the failure to pay severance and incentive compensation. The court dismissed his severance claims with prejudice [Dkt. 24.], and these motions for reconsideration and judgment on the pleadings followed.

## II. Analysis

### A. Motion to Reconsider

In a prior order, the court concluded that Wilkerson's Offer Letter contemplated severance only "in the event of his involuntary termination," not voluntary resignation. [Dkt. 24 at 5.] It therefore dismissed Count I (Breach of Contract) and Count III (Violation of the IWPCA) with prejudice. [*Id.*] Wilkerson now moves for reconsideration. Because the court finds no manifest error in its prior decision, the motion is denied.

#### 1. Legal Standard

Motions to reconsider are disfavored and "are not meant to give parties a second bite at the apple." *Svoboda v. Amazon.com, Inc.*, 2025 WL 2240408, at *1 (N.D. Ill. Jan. 6, 2025) (citing *Vesely v. Armslist LLC*, 762 F.3d 661, 666 (7th Cir. 2014)). They are not vehicles to "rehash[] previously rejected arguments or argu[e] matters that could have been heard during the pendency of the previous motion." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996). Rather, they serve the limited functions of presenting "newly discovered evidence" or otherwise correcting "manifest errors of law." *Caisse Nationale de Credit Agricole*, 90 F.3d at 1269 (internal quotations and citation omitted). In other words, they are appropriate when the court "has patently misunderstood a party, [] has made a decision outside the adversarial issues presented to the [c]ourt by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester*

---

[1] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

*Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (internal quotations and citation omitted). Such circumstances are rare, *id.*, and the court retains discretion in determining whether to grant the motion. *Caisse Nationale de Credit Agricole*, 90 F.3d at 1270.

    **2.    Severance**

The failure-to-pay-severance claims rise and fall with Wilkerson's right to severance under the Offer Letter. In considering Lurie Children's motion to dismiss, then, the court's task was to interpret the letter, which states that, "[i]n the unlikely event your employment should be terminated for any reason other than cause, you will receive severance pay of twelve (12) months' salary." [Dkt. 1-1.] The court granted the motion, concluding that the phrase "[i]n the unlikely event" evinced the parties' intent to provide severance only in the event of involuntary termination. [Dkt. 24 at 4.] It also noted that, otherwise, Wilkerson "would have no incentive to continue in his position: he could simply resign, receive a substantial payout, and be rewarded for not doing his job"—an absurd result "the parties were highly unlikely to have agreed to." [*Id.* at 4–5.]

Wilkerson now argues that the court departed twice from the established rules of contract interpretation, first when it "ruled that the parties' intent may be inferred from Defendant's use of the passive voice," and second when it "read the at-issue letter to favor the drafting party and created a limitation not found in the plain language of the parties' agreement." [Dkt. 26 at 2–3.] He also challenges the court's conclusion about the absurd result. [*Id.* at 3–4.]

The court, however, never inferred the parties' intent from the passive voice. Rather, it noted that, per the Supreme Court, "'context can confine a passive-voice sentence to a likely set of actors.'" [Dkt. 24 at 4 (quoting *Bartenwerfer v. Buckley*, 598 U.S. 69, 75–76 (2023)).] *See also E. I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 128 (1977) (affirming dismissal despite "passive voice" not "answer[ing] the question," because "other parts of the statute leave little doubt"); *People v. Clark*, 248 N.E.3d 1087, 1094 (Ill. 2024) (interpreting passive voice in context to refer to a specific actor). Then, emphasizing the phrase "[i]n the unlikely event," it observed that "it would be peculiar for Lurie Children's to opine on the likelihood of Wilkerson eventually resigning." [Dkt. 24 at 4.] This context—not the passive voice alone—left the court with little doubt and prompted its conclusion: that, "[r]ead as a whole and in context," the relevant sentence contemplates only involuntary termination. [*Id.* at 5.]

Nor did the court "depart[] from the established rules of contract interpretation when it read the at-issue letter to favor the drafting party." [Dkt. 26 at 3.] Under Illinois law, the "doctrine of *contra proferentem* [] dictates that ambiguous terms in a contract be construed against the drafter." *Tranzact Techs., Ltd. v. Evergreen Partners, Ltd.*, 366 F.3d 542, 546 n.2 (7th Cir. 2004). The key word, here, is

3

*ambiguous*—as Wilkerson recognized in his opposition brief. [Dkt. 16 at 4 ("Assuming, *arguendo*, the at-issue provision is ambiguous, then dismissal is still improper because ambiguous terms are construed strictly against the drafter Lurie Children's").] But the court never held that the letter's plain language was ambiguous. True, 'terminate,' standing alone, "could mean a voluntary resignation, an involuntary termination, or both." [Dkt. 24 at 4.] But it doesn't stand alone: read with the context of "[i]n the unlikely event," the letter's intent is clear.

To be sure, Wilkerson made the same arguments in his response to the motion to dismiss. He disagreed with the idea that, because he was the "passive recipient or object of the sentence," Lurie's Children's could ever be understood as its "active subject or actor." [Dkt. 16 at 2.] And he made careful note of his belief in the anti-drafter rule's applicability. [*Id.* at 4.] He now re-frames those points as departures from the established rules of contract interpretation, but it's clear he simply disagrees with the court's reasoning and is reviving previously rejected arguments.

So, too, is his opposition to the 'absurd result' conclusion a mere disagreement over reasoning and a rehash of rejected arguments.[2] *Covinsky v. Hannah Marine Corp.*, which Wilkerson says provides no help in interpreting the letter, observed that if "'termination' encompasses a voluntary resignation, the employee has no incentive to continue in his position and to make the transition to the new owner/management because he knows, if he resigns upon the transition, he will receive a substantial payout. … This makes no sense." 903 N.E.2d 422, 429 (Ill App. Ct. 2009). This court agrees—and Wilkerson's argument that this "abstract concern … ignores that he was employed by Lurie Children's for almost 10 years" is irrelevant. [Dkt. 26 at 4.] The letter was not drafted with the benefit of hindsight.

The court therefore finds no manifest error in its decision to dismiss Wilkerson's claims for severance. The motion for reconsideration is denied.

### B. Judgment on the Pleadings

Count II (Breach of Contract: Failure to Pay Incentive Compensation) and Count IV (Violation of the IWPCA: Failure to Pay Earned Bonus) remain. Lurie Children's has moved for judgment on the pleadings, arguing that its Leadership Incentive Plan controls, requiring Wilkerson to have been actively employed to receive incentive compensation, i.e. his earned bonus. At this stage, the court cannot agree.

---

[2] Section II of his opposition brief is titled, "Plaintiff's Interpretation is Consistent with Illinois Law and Does Not Lead to An Absurd Result." [Dkt. 16 at 5.]

4

1.  **Legal Standard**

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." "Pleadings 'include the complaint, the answer, and any written instruments attached as exhibits.'" *Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 312–13 (7th Cir. 2020) (quoting *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998)). The standard is the same as a motion to dismiss: viewing facts and inferences in the light most favorable to the nonmovant, the motion will be granted only if "it appears beyond doubt that the nonmovant cannot prove facts sufficient to support its position." *Id.* at 13 (quoting *Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 972 F.3d 915, 919 (7th Cir. 2020)). Therefore, "the moving party must demonstrate that there are no material issues of fact to be resolved." *Id.* (quoting *N. Ind. Gun & Outdoor Shows*, 163 F.3d at 452).

2.  **Incentive Compensation**

Lurie Children's makes two arguments in support of its motion. It first argues that the Offer Letter states "only that Wilkerson would be 'eligible' for a bonus"—an equivocation that dooms his IWPCA claim. [Dkt. 33 at 5.] It also argues that, regardless, he "did not satisfy all conditions for receiving a bonus," since its FY23 Leadership Incentive Plan requires "employees to be actively employed at the time of the incentive compensation payout." [*Id.* at 6.] Wilkerson resigned prior, and so if the LIP controls, it would prove fatal to both his IWPCA and breach of contract claims.

Under the IWPCA, "[a]n employee has a right to an earned bonus when there is an *unequivocal promise by the employer* and the employee has performed the requirements set forth in the bonus agreement." *Hess v. Bresney*, 784 F.3d 1154, 1162 (7th Cir. 2015) (quoting 56 Ill. Adm. Code § 300.500 (2014)). The Seventh Circuit has observed that eligibility "is no guarantee"—and terms that state that an employee "will be eligible to receive [] a bonus" may not "be the kind of unequivocal promise that is required under applicable Illinois law." *Id.*

But *eligibility* could either vest an employer with discretion or condition receipt on precise criteria. *See, e.g.*, *DeGeer v. Gillis*, 707 F. Supp. 2d 784, 798 (N.D. Ill. 2010) (observing that eligibility is not "inherently discretionary"). In *Hess*, for example, the relevant provision stated that "effective immediately you will be eligible to receive as a bonus 40% of all fee revenue generated except as follows: a) no bonus will be paid on the first $100,000 of annual fee revenue generated; and, b) if it is otherwise eligible, only a 10% bonus will be paid for fees generated on the Robert Thompson file." 784 F.3d at 1160. Compared to Wilkerson's Offer Letter, which noted that incentive compensation was based on "mutually established objectives as well as achievement of organizational goals, and plan terms that are subject to approval," [Dkt. 1-1], the *Hess* contract lacked any objective factors, except two limiting criteria unrelated to threshold eligibility. *See* § 300.500 (distinguishing "discretionary"

5

bonuses from those "when the earning of a bonus is based on objective factors such as length of service, attendance or sign-on or relocation incentives"). Drawing inferences in Wilkerson's favor, as the court must, the Offer Letter could reasonably make an unequivocal—albeit contingent—promise of payment.

The IWPCA, however, also provides that when "one of the conditions for the bonus is that the employee be on the payroll at the time of the bonus payout," an employee has no right to an earned bonus. *Id.* So, too, would failing to meet that condition undermine Wilkerson's claim that Lurie Children's breached a contract by failing to pay incentive compensation. The LIP, which Lurie Children's attached to its answer, states that "[i]n the case of voluntary resignation, prior to the date of payment, or involuntary termination for Cause at any time, a Participant shall forfeit all rights to any payout." [Dkt. 25-1 at 8.] The only question, then, is whether, at this posture, the court must accept the LIP as controlling.

Wilkerson argues that, "[e]ven though Lurie Children's asserts the LIP controls, Defendant never explains why a document introduced mid-fiscal year would supersede the Agreement." [Dkt. 45 at 4.] He also observes that the LIP itself states that "'[p]articipants will be advised of their eligibility and applicable target percentage at or near the beginning of each Plan Year' which was impossible given that the LIP was implemented nearly four (4) months after the start of FY23." [*Id.* at 6.] Lurie Children's, meanwhile, contends that the Offer Letter "specifically notes [incentive compensation terms] are subject to approval by the Board Compensation Committee." [Dkt. 50 at 3.] It also argues that it is "undisputed that Wilkerson received notice of the revisions to the LIP terms five months before he voluntarily resigned and before the Fiscal Year 2023 bonuses were paid." [*Id.* at 1–2.]

Viewing the facts in a light most favorable to Wilkerson, however, there exists at least a question as to the binding effect of the LIP. For one, the version of the LIP affixed to Lurie Children's answer is an attachment to an email that does not specify its recipients, except insofar as it's addressed to "Leaders." [Dkt. 25-1 at 2.] Nor is the Board Compensation Committee's involvement in the change immediately clear, to the extent Lurie Children's relies on that provision of the Offer Letter to argue that terms are "subject to review." [Dkt. 50 at 3.] The Seventh Circuit has explained that "[d]istrict courts should not allow motions for judgment on the pleadings to deprive the non-moving party of the opportunity to make its case," and Wilkerson deserves a thorough opportunity to show why the LIP does not control. *Federated Mut. Ins. Co.*, 983 F.3d at 313.

Indeed, the Seventh Circuit observed in *N. Ind. Gun & Outdoor Shows, Inc.* that, when exhibits—authored by defendants—were attached to a complaint but stood in "direct opposition" to the complaint's allegations, "it would be unwise to accept these unilateral statements as explaining the entire story at this early point in the litigation." 163 F.3d at 456. And there, the *plaintiff* had attached the at-issue

6

letters to its *own* complaint. *Id.* It follows that a court need not immediately accept and rely on what a defendant attaches to its own answer.

It would be different, say, if Lurie Children's had first introduced the Offer Letter, revealing that it directly contradicted Wilkerson's claims. But here, as in *N. Ind. Gun & Outdoor Shows, Inc.*, the LIP does not form the basis of Wilkerson's claim. *See id.* at 456 (holding that defendant's "statements cannot summarily trump [plaintiff's] allegations because the letters themselves do not form the basis of [plaintiff's] claim"). The Offer Letter does, at least according to the complaint.

Accordingly, the court denies Lurie Children's motion for judgment on the pleadings.

### III. Conclusion

For these reasons, the court denies both Wilkerson's motion for reconsideration and Lurie Children's motion for judgment on the pleadings.

Enter: 24-cv-8488
Date: November 13, 2025

_____
Lindsay C. Jenkins